# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

CYNTHIA HICKS,

                    **Plaintiff,**

-vs-                                             **Case No. 6:04-cv-444-Orl-KRS**

COMMISSIONER OF SOCIAL
SECURITY,

                    **Defendant.**

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by

Cynthia Hicks, seeking review of the final decision of the Commissioner of Social Security

denying her claim for social security disability benefits.  Doc. No. 1.  The Commissioner answered

the Complaint and filed a certified copy of the transcript of the proceedings before the Social

Security Administration.  Doc. Nos. 4, 5.  This matter has been referred to me under 28 U.S.C. §

636(c) pursuant to the consent of the parties.

## I.      PROCEDURAL HISTORY.

On February 12, 2002, Hicks filed an application for a period of disability and disability

insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program

(OASDI), 42 U.S.C. § 401 *et seq*.  TR. 44-46.  Hicks' claim was denied, initially and upon

reconsideration.

Hicks requested a hearing before an administrative law judge (ALJ), which was held on

July 1, 2003.  TR. 369-84.  Hicks, who was represented by an attorney, testified at the hearing.  *Id*.

After considering the testimony and the medical evidence presented, the ALJ found that Hicks had not engaged in substantial gainful activity since November 21, 2001, her alleged disability onset date.  TR. 22.  The ALJ concluded that the medical evidence indicated that Hicks suffered from fibromyalgia[1] and an affective disorder.  TR. 19.  The ALJ determined that Hicks' impairments were severe but that they did not meet or equal any of the impairments listed in the applicable social security regulations.  *Id*.  With respect to Hicks' affective disorder, the ALJ found that her "depression is not of the severity of section 12.04 pertaining to affective disorders, and characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  *Id*.

The ALJ determined that Hicks' mental impairment had resulted in the following nonexertional limitations:  "mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and . . . mild difficulties in maintaining concentration, persistence or pace."  TR. 21.  In reaching this determination, the ALJ accorded "little weight" to the opinion of Balinder Chahal, M.D., one of Hicks' treating physicians, concluding that Dr. Chahal's medical records did not support his opinion as to the limitations arising from Hicks' mental impairment.  TR. 21. The ALJ also mentioned the opinions of two "State Agency psychologists"[2]  who either

---

[1] Fibromyalgia is "[a] syndrome characterized by chronic pain, stiffness, and tenderness of muscles, tendons, and joints without detectable inflamation. . . . [U]ndue fatigue plagues the large majority of patients with fibromyalgia and sleep disorders are common in fibromyalgia." MEDICINENET.COM, www.medterms.com/script/main/art.asp?articlekey=3453 (last visited Sept. 20, 2005).

[2] Although the ALJ does not name the psychologists whom he relied upon in reaching his determination as to Hicks' mental impairment, I note that William W. Austin, Psy.D., and Jeffrey L. Pricket, Psy.D., are the only psychologists of record who either examined Hicks or reviewed her

examined Hicks or reviewed her records at the request of the SSA.  He noted that these physicians opined that Hicks would have moderate limitations in activities of daily living, social functioning, and maintaining concentration, persistence and pace, and one or two repeated episodes of decompensation, each of extended duration.  TR. 20-21.  The ALJ did not explain why he did not accept the opinions of these psychologists.

The ALJ found that Hicks had the residual functional capacity (RFC) to perform light work.[3]  TR. 20, 22.  In reaching this determination, the ALJ noted that Hicks' "statements are not fully credible and not persuasive of an inability to perform work-related activities."  TR. 20.  The ALJ accorded "significant weight" to the opinion of Nitin Haté, M.D., who examined Hicks at the request of the SSA.  *Id.*[4]  The ALJ accorded "little weight" to the opinion of Tadur Reddy, M.D., one of Hicks' treating physicians because he found Dr. Reddy's opinion to be inconsistent with his treatment of Hicks and with the medical evidence as a whole.  *Id.*

---

records at the request of the SSA.  Their opinions are discussed in more detail below.

[3] Pursuant to 20 C.F.R. § 404.1567(b), light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  The regulation further provides that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  *Id.*

[4] The ALJ also appears to have also relied upon the opinions of "State Agency physicians" who reviewed Hicks' records at the request of the SSA in support of his determination that Hicks had the RFC to perform light work.  TR. 20.  The ALJ does not reference the "State Agency Physicians" whom he relied upon in reaching his determination as to Hicks' RFC.  M. De la Cerna, M.D., and Violet A. Stone, M.D., both reviewed Hicks' records and prepared physical residual functional capacity assessments at the request of the SSA.  Their opinions are discussed in more detail below.

In closing, the ALJ concluded that Hicks' "past relevant work as [a] sales clerk did not

require the performance of work-related activities precluded by her residual functional capacity . . .

." TR. 22.  Consequently, the ALJ determined that Hicks was not disabled.  *Id*.

Hicks requested review of the ALJ's decision by the Appeals Council.  On February 6,

2004, the Appeals Council denied Hicks' request for review.  TR. 6-8.  This appeal timely

followed.  Doc. No. 1.

## II.    JURISDICTION.

The ALJ's decision become the final decision of the SSA once the Appeals Council denied

Hicks' request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. §

404.981.  This Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g).

## III.   STATEMENT OF FACTS.

A.    *Hicks' Testimony*.

Hicks was born on March 21, 1960.  TR. 372.  She took some college courses but she

never earned a degree.  *Id*.  Hicks' prior work history included employment as mental retardation

technician, night auditor, cashier/sales and stock person at Wal-Mart.  TR. 378.  Hicks testified

that she was unable to perform any of these jobs because she could not concentrate or do the lifting

and bending required.  *Id*.

At the time of her hearing, Hicks suffered from, among other things, headaches, pain in her

shoulders, elbows, rib cage, hips, lower back, knees and feet.  *Id*.  She weighed approximately 217

pounds.  TR. 382.  Hicks is 5'5" inches tall.  *Id*.

Sometimes, Hicks experienced a "shooting pain from [her] spine over up to [her] shoulder" when she tried to "pick something up." TR. 373. She had trouble lifting a gallon of milk. TR. 373. Hicks had trouble gripping with her left hand. TR. 382. Hicks stated that she was able to lift about 15 pounds "twice an hour." TR. 379. She was able to stand and/or walk for about 45 minutes. She was able to sit for about 30 minutes. *Id*.

In a typical week, Hicks experienced four headaches, each lasting a day in duration. *Id*. Hicks also suffered from anxiety and depression. TR. 374. She took Lexapro and Wellbutrin for her anxiety and depression. The Wellbutrin made her sleepy. TR. 381. Hicks testified that before she was on medication, she cried readily and thought about suicide frequently. TR. 372. Since she had obtained medication, she was no longer thinking about suicide. Nevertheless, Hicks stated that she "still would rather be dead than alive." TR. 374.

She did not have health insurance, and she had not had regular access to doctors since September 4, 2002. TR. 379-80, 383. She could not go to counseling because she did not have sufficient gasoline to drive to the sessions. TR. 382. Hicks took Motrin for her pain, but she stated that it did not help. TR. 373. She had prescriptions from an emergency room that she could not afford to fill. TR. 373.

On a typical day, Hicks would wake up, fix something to drink, and sit in front of the fan. TR. 376. Hicks watched television during the day and she enjoyed playing with her grandkids. TR. 377. She could not concentrate enough to read a book. TR. 376. She was unable to perform basic household chores, such as vacuuming, mopping, and sweeping. TR. 380. She did her laundry, but her grandson helped her take the clothes out of the dryer. TR. 377. Hicks could drive

-5-

for about 45 minutes, after which her left side started hurting.  TR. 380.  She was unable to shop

for groceries by herself.  TR. 381. When her husband came home, she would fix either a

microwavable dinner or hamburger helper.  She went to bed at midnight, but was often unable to

fall asleep until 3:00 or 4:00 a.m.  *Id.*  Hicks did not sleep well as a result of anxiety and pain.  TR.

376, 381.

     B.    *Medical Evidence.*

Hicks was treated by Roberto M. Arias, D.C., for neck, back and shoulder pain on several

occasions in September and October 1999.  TR. 120-23.

On November 11, 1999, Hicks was examined by Paul J. Maluso, M.D., at Regional

Orthopedic Associates.  TR. 17, 89.  Dr. Maluso noted that Hicks was having problems with her

neck, left shoulder and rib cage area.  TR. 89.  Dr. Maluso reviewed x-rays of Hicks' left shoulder

and her lumbar and thoracic spine.  Dr. Maluso noted that the x-rays revealed no fractures or

dislocations, and no "far-advanced" arthritic changes.  *Id.*  Dr. Maluso's impression was that Hicks

suffered from chronic neck pain, chronic shoulder pain, chronic left rib pain, chronic

thoracolumbar pain and chronic lumbar pain.  *Id.*

Hicks was treated by Carlos L. De Orduna, M.D., from March 2000 to November 2001.

TR. 90-105, 108-09.[5]  His records reflect that Hicks complained of pain in her back, right

shoulder, hips, and feet.  TR. 101, 104, 108-09.  On January 29, 2001, Dr. Orduna diagnosed

---

     [5]  Dr. De Orduna's handwritten notes are largely illegible.

Hicks with fibromyalgia and depression.  TR. 97.  Hicks was treated with Flexeril,[6] Naproxen,[7]

hydrocodone[8] and Effexor.[9]  TR. 17, 104.

On June 13, 2000, William B. Hearn, M.D., reviewed x-rays taken of Hicks' spine.  TR.

106.  Dr. Hearn found no fractures in the thoracic and lumbar regions of Hicks' spine.  However,

Dr. Hearn concluded that Hicks had degenerative spondylosis[10] without fracture with respect to her

thoracic spine.  *Id*.

Hicks was again treated by Dr. Arias for back and neck pain on several occasion in

November and December 2001.  TR. 110-119.  On each occasion, Dr. Arias noted that Hicks'

condition was chronic.  In November 2001, Dr. Arias prescribed "[n]o pushing, pulling or lifting

over 5 lbs.  No repetitive bending, stooping or twisting.  Allow to change positions as needed.  No

standing longer than one hour at a time.  No repetitive use of upper extremities."  TR. 110.  On

December 27, 2001, Dr. Arias revised these restrictions to "no bending, stopping, twisting or

---

[6] Flexeril is a muscle relaxant. MEDICINENET.COM, www.medicinenet.com/cyclobenzaprine/article.htm (last visited Sept. 20, 2005).

[7] Naproxen is a non-steroidal anti-inflammatory used for the management of mild to moderate pain, fever, and inflamation. MEDICINENET.COM, www.medicinenet.com/naproxen/article.htm (last visited Sept. 20, 2005).

[8] Hydrocodone is a narcotic analgesic used to relive pain. MEDLINE PLUS, www.nlm.nih.gov/medlineplus/druginfo/uspdi/202390.html (last visited Sept. 20, 2005).

[9] Effexor is an anti-depressant medication that affects chemical messengers within the brain. MEDICINENET.COM, www.medicinenet.com/venlafaxine/article.htm (last visited Sept. 20, 2005).

[10] Spondylosis is defined as "[d]egeneration of the disc spaces between the vertebrae." MEDICINENET.COM, www.medterms.com/script/main/art.asp?articlekey=13959 (last visited Sept. 20, 2005).

overhead work, no reaching and no lifting over 10 lbs.," which restrictions were in effect for four weeks.  TR. 111.

On December 10, 2001, Hicks was treated by Baldev Lalli, M.D., at Family Physicians of Hunters Creek, P.A.  TR. 177.  Hicks complained that she was experiencing pain in her left rib cage and thoracic spine.  Dr. Lalli noted that Hicks suffered from, among other things, obesity, fibromyalgia and neck adenitis.  *Id*.  Dr. Lalli prescribed Floxin[11] and Demerol.[12]  In December 2001 and January 2002, Hicks returned complaining of thoracic spine, left hip, right knee, and left shoulder pain.  TR. 175-76.  Dr. Lalli noted that x-rays of Hicks' shoulder, hip, thoracic and lumbar spine were normal.  TR. 175.   He also noted that Hicks was suffering from major depression, for which he prescribed Celexa.  TR. 174.   Later in January 2002, Dr. Lalli observed that Hicks was still sad and lacked energy, but she was not suicidal.  TR. 174.  Dr. Lalli continued to increase the dosage of Celexa in an attempt to address Hicks' depression.  TR. 171.

Hicks was treated at Sand Lake Hospital in February 2002.  An MRI of her thoracic spine showed mild degenerative spondylotic changes consistent with fibromyalgia.  TR. 157.

On March 27, 2002, Hicks was examined by Scott Shepard, PT, at HealthSouth.  Hicks complained that she was experiencing pain in her neck, back, and hips, and tingling in her hands. TR. 182.  Examination revealed slight to moderate restrictions in flexibility and limitation in range

---

[11] Floxin is an antibiotic that stops bacteria multiplication by inhibiting the reproduction and repair of their genetic material (DNA). MEDICINENET.COM, www.medicinenet.com/ofloxacin/article.htm (last visited Sept. 12, 2005).

[12] Demerol is a narcotic analgesic used to relieve moderate to severe pain. MEDICINENET.COM, www.medicinenet.com/meperidine-oral/article.htm (last visited Sept. 12, 2005).

of motion and postural activities.  TR. 182-84.  Shepard recommended "skilled rehabilitative

therapy in conjunction with a home exercise program . . . ."  TR. 183.

On April 22, 2002, Nitin Haté, M..D., examined Hicks at the request of the SSA.  TR. 185-

87.  Hicks complained of multiple deep joint pains, low back pain radiating into both legs, left heel

pain and depression, among other things.  TR. 185.  Dr. Haté observed that Hicks was obese.  TR.

185.  Dr. Haté noted that Hicks had difficulties with gait and station, toe and heel walking and

squatting.  TR. 186.  Specifically, Dr. Haté noted that Hicks "limps due to left side plantar

fasciilitis."  *Id*.  With respect to squatting, Dr. Haté observed that Hicks "[a]ccomplished 50% with

difficulty standing up."  *Id*.  He observed that her muscle and grip strength were good and that she

had full range of motion except in her thoracolumbar spine and both shoulders.  Dr. Haté opined

that Hicks "will have difficulty in strenuous activities including prolonged walking, climbing stairs

or ladders, and repetitive stooping and squatting."  TR. 187.

On April 24, 2002, William W. Austin, Psy.D., and Kathy Lee, L.M.H.C.,[13] examined

Hicks and prepared a disability evaluation at the request of the SSA.  TR. 189-91.  Austin and Lee

noted that Hicks had a mental health treatment history dating back to 1986.  TR. 189.  Hicks

reported that she was experiencing crying spells, low self-esteem, anxiety and suicidal thoughts,

and that she felt like her life was out of control.  She had to change positions frequently during the

evaluation due to muscle spasms.  The disability evaluation indicated that Hicks did not

demonstrate any overt symptoms of psychosis such as hallucinations, delusions, or ideas of

reference.  TR. 190.  Her attention and concentration were sustained throughout the evaluation.

---

[13] Licensed Mental Health Counselor.

Her mood was depressed, and her affect was mood congruent.  She was tearful throughout the evaluation.  Her judgment, impulse control, and insight were considered limited.  TR. 190.  Hicks was diagnosed with "major depressive disorder, recurrent, moderate anxiety disorder, not otherwise specific." *Id*.

On April 30, 2002, Hicks was admitted to Lakeside Alternatives, Inc. (Lakeside) as a voluntary patient under the Baker Act, also know as the Florida Mental Health Act, Fla. Stat. § 394.451 *et seq*.  TR. 263.  Specifically, Hicks complained that she was having suicidal thoughts with a plan to overdose on pills and alcohol.  TR. 263.  She acted inappropriately, smiling as she talked about killing herself.  She also expressed feelings of hopelessness and helplessness.  TR. 250.

On May 1, 2002, Jenaro Fernandez, M.D., examined Hicks.  His impression was that Hicks sought treatment "because she wants to obtain the Social Security benefits due to psychiatric reasons . . . ."  TR. 237.  Dr. Fernandez also observed that Hicks "tries to dramatize her admission saying that she had nothing to look forward to; particularly she has no money."  *Id*.  Upon examination, Dr. Fernandez observed "no perceptual disturbances, no auditory or visual hallucinations, paranoid ideas, or delusions; no active pursuits of suicide . . . ."  TR. 240.  However, he opined that Hicks' complaints of depression were "for real," and that she needed a change of medication.  TR. 215.  Dr. Fernandez found that Hicks had a Global Assessment of Functioning (GAF) score of 35.[14]  *Id*.  Dr. Fernandez further noted that Hicks' GAF for the past

---

[14] The GAF scale is used to report an individual's overall level of functioning.  A rating of 31-40 reflects:

-10-

year was 65.[15]  *Id*.  Dr. Fernandez's diagnosis was that Hicks suffered from, among other things,

adjustment disorder with depression secondary to pain and other stressors.  *Id*.

Hicks participated in several group therapy sessions while at Lakeside.  TR. 211, 222, 224-25, 231-32.  Treatment notes reflect that she, at times, had a flat affect and lacked insight, with poor judgment.  TR. 216.  On May 2, 2002, Dr. Fernandez noted that Hicks was taking Celexa and Wellbutrin for her depression.  TR. 215.  Hicks reported that she was no longer having suicidal thoughts.  TR. 215.

Hicks was discharged from Lakeside on May 3, 2002.  TR. 200.  Dr. Fernandez noted that Hicks "was no longer verbalizing any suicidal ideations."  TR. 201.  Her affect and mood remained calm.  She denied any further suicidal ideation and stated that she was no longer feeling hopeless about her future.  *Id*.  Dr. Fernandez's final impression was that Hicks suffered from, among other things, adjustment disorder with depression secondary to pain and other stressors,

_____

Some impairment in reality testing or communication (e.g., speech is at times illogical obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . . .

HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed. 1998) (SYNOPSIS OF PSYCHIATRY).

[15] A GAF score between 61 and 70 indicates some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, with some meaningful interpersonal relationships.  *Id*.

chronic pain in her spine, shoulders, hips, knees and fibromyalgia.  TR. 200.  Dr. Fernandez

assigned a GAF of 60 to Hicks at the time of her discharge.[16]  *Id*.

On May 7, 2002, Hicks was evaluated by Patricia Borno, a licensed mental health

counselor.  Hicks reported feeling depressed, but not suicidal.  Borno noted that Hicks' memory

wandered and her concentration was poor.  She expressed low self-esteem.  Borno's impressions

were major depression, recurrent and episodic, severe without psychotic features, with post

traumatic stress disorder (PTSD) in remission.  She assigned Hicks a GAF of 55.  TR. 278-79.

On May 14, 2002, Balinder Chahal, M.D., conducted a psychiatric evaluation of Hicks.

TR. 308-09.  Hicks reported that she was experiencing anxiety attacks and that she occasionally

had nightmares or flashbacks about past abuse issues with her husband.  TR. 308.  Dr. Chahal

observed that Hicks was a bit tense and anxious and that she exhibited some psychomotor

retardation.  Dr. Chahal noted that Hicks' memory for remote, recent, and recall events appeared to

be adequate and that her attention and concentration were fair.  TR. 309.  Dr. Chahal's impression

was that Hicks was suffering from major depressive disorder recurrent severe, and panic disorder

without agoraphobia.  *Id*.  Dr. Chahal opined that Hicks had a GAF score of 55.  Dr. Chahal saw

Hicks again in June, but his treatment notes for this visit are illegible.  TR. 307.

---

[16] A rating of 51-60 reflects:

Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic
attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few
friends, conflicts with peers or coworkers).

SYNOPSIS OF PSYCHIATRY at 299.

On June 19, 2002, Dr. Chahal filled out a mental impairment questionnaire for Hicks. TR. 303-07. Dr. Chahal opined that Hicks had the following symptoms: (1) anhedonia[17] or pervasive loss of interest in almost all activities; (2) appetite disturbance with weight change; (3) decreased energy; (4) feelings of guilt or worthlessness; (5) generalized persistent anxiety; (6) somatization[18] unexplained by organic disturbance; (7) mood disturbance; (8) difficulty thinking or concentrating; (9) psychomotor agitation or retardation; (10) persistent disturbances of mood or affect; (11) recurrent obsessions or compulsions which are a source of marked distress; (12) emotional withdrawal or isolation; (13) motor tension; (14) easy distractibility; (15) memory impairment – short, intermediate or long term; and (16) sleep disturbance. TR. 304.

Dr. Chahal determined that Hicks had marked limitations in maintaining social functioning, and in concentration, persistence or pace. TR. 305. He further opined that Hicks had mild limitations in activities of daily living. *Id.* He further concluded that Hicks would experience three repeated episodes of decompensation during a twelve month period, each of at least two weeks duration. TR. 305-06. Dr. Chahal concluded that Hicks' impairments would cause her to be absent from work more than four days per month. TR. 306. He based his conclusions upon a medically documented history of a chronic affective disorder that had caused more than a minimal limitation of ability to do basic work activity, supported by a current history of one or more years'

---

[17] Anhedonia is defined as "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable." STEDMAN'S MEDICAL DICTIONARY 90 (26th ed. 1995) (STEDMAN'S).

[18] Somatization is "[t]he process by which psychological needs are expressed in physical symptoms . . . ." STEDMAN'S at 1634.

inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.  TR. 306.

On May 30, 2002, Joseph Flynn, Jr., M.D., examined Hicks.  TR. 361-62.  Dr. Flynn noted that an MRI of Hicks' thoracic and lumbar spine, taken by Dr. Lalli in February 2002, revealed no significant neurocompressive pathology, bony lesion or tumor.  TR. 362.  Dr. Flynn's assessment was that Hicks suffered from axial back pain that appeared musculoskeletal in nature and could be related to her fibromyalgia.  *Id.*

On June 5, 2002, Tadur Reddy, M.D., a physician at Family Physicians of Hunters Creek, treated Hicks for her complaints left shoulder pain.  On examination, he observed tenderness and reduced range of motion.  His assessment was bursitis and fibromyalgia.  TR. 345.  After reviewing Hicks' chart, Dr. Reddy prepared a physical residual functional capacity assessment.  TR. 281-85, 345.  He noted that Hicks suffered from depression and fibromyalgia and that her prognosis was poor.  TR. 281, 284.  Dr. Reddy opined that Hicks could only stand or walk less than two hours a day.  TR. 282.  Dr. Reddy further opined that Hicks required a job that permits shifting positions at will from sitting, standing or walking, and that she would need to take unscheduled breaks every hour during an eight-hour work day.  *Id.*  Dr. Reddy further noted that Hicks could sit for 30 minutes at one time before needing to get up.  TR. 284.  Dr. Reddy noted that Hicks could lift less than 10 pounds frequently and that she could only occasionally look down, turn her head right or left, look up, hold her head in a static position, twist, stoop, crouch, climb ladders and climb stairs.  TR. 283.  Hicks would constantly experience pain that would

-14-

interfere with her attention and concentration.  Dr. Reddy opined that Hicks was incapable of even "low stress" jobs.  TR. 284.

On August 12, 2002, Karamali Bandealy, M.D., examined Hicks.  TR. 310-11.  Dr. Bandealy, whose specialty is arthritic and rheumatological diseases, noted that Hicks' upper and lower extremity joints had normal range of motion without significant pain and that there was no muscle wasting or significant deformities of the joints.  TR. 311.  Dr. Bandealy's impression was that Hicks suffered from fibromyalgia syndrome, depression with anxiety attacks, hypercholesterolemia,[19] and possible degenerative joint disease (DJD) of the lumbar spine and cervical spine.  *Id.*

On August 28, 2002, Curtis J. Black, M.D., examined Hicks.  TR. 314.  Hicks complained that her left ribs were swollen and tender.  Dr. Black's assessment was that Hicks was suffering from "[a]cute muscular strain, left upper quadrant and rib cage area[,] possible costochondritis."[20] *Id.*

Hicks was treated at Lakeside for her depression in April and May 2003.  She reported that Wellbutrin and Lexapro helped her depression some, and that she was no longer suicidal or crying.  However, she still complained of lack of energy and motivation.  TR. 346.  The treatment note

---

[19] "The presence of an abnormally large amount of cholesterol in the cells and plasma of the circulating blood."  STEDMAN'S at 823.

[20] "Inflamation of one or more costal cartilages, characterized by local tenderness and pain of the anterior chest wall that may radiate , but without the local swelling typical of Tietze's syndrome."  STEDMAN'S at 403.

reflects that Hicks had a mildly depressed mood with a constricted affect.  TR. 346.  The physician's notes indicate that Hicks had a GAF score of 45-50.[21]  TR. 346.

    C.    *Reviewing Professionals.*

    1.    <u>Physical RFC Assessments</u>.

On May 1, 2002, M. De la Cerna, M.D., reviewed Hicks records and prepared a physical residual functional capacity assessment at the request of the SSA.  TR. 192-199.  Dr. De la Cerna opined that Hicks could frequently lift 10 pounds and occasionally lift 20 pounds.  She could sit, stand or walk (with normal breaks) six hours a day.  TR. 193.

On September 14, 2002, Violet A. Stone, M.D., reviewed Hicks' records and prepared a physical residual functional capacity assessment.  TR. 320-27.  She opined that Hicks could frequently lift 10 pounds and occasionally lift 20 pounds.  She could sit, stand or walk (with normal breaks) six hours a day.  TR. 321.  She noted that Hicks suffered from, among other things, chronic fatigue.  *Id.*  Dr. Stone opined that Hicks could occasionally stoop, crouch, and perform climbing activities.  TR. 322.

    2.    <u>Mental RFC Assessments</u>.

On June 10, 2002, Eric Wiener, Ph.D., reviewed Hicks' records and prepared a psychiatric review technique at the request of the SSA.  TR. 286-99.  Dr. Wiener noted that Hicks suffered

---

[21] A rating of 45-50 reflects:

> Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

SYNOPSIS OF PSYCHIATRY at 299.

from affective and anxiety-related disorders.  TR. 286.  Dr. Wiener further noted that Hicks'

mental impairments resulted in moderate functional limitations in (1) restriction of activities of

daily living; (2) difficulties in maintaining social functioning; and (3) difficulties in maintaining

concentration, persistence, or pace.  In addition, Dr. Wiener indicated that Hicks' mental

impairments resulted in one or two repeated episodes of decompensation, each of extended

duration.  TR. 296.

Dr. Wiener also prepared a mental residual functional capacity assessment.  TR. 301.  In

sum, Dr. Wiener opined that Hicks had moderate limitations in her ability to understand,

remember, and carry out detailed instructions, maintain attention and concentration for extended

periods, complete a normal work-day and workweek without interruptions from psychologically

based symptoms and to perform at a consistent pace without an unreasonable number and length of

rest periods, interact appropriately with the general public, and accept instructions and respond

appropriately to criticism from supervisors.  TR. 300-01.

On September 18, 2002, Jeffrey L. Prickett, Psy.D., reviewed Hicks' record and prepared a

psychiatric review technique at the request of the SSA.  TR. 328-41.  Dr. Prickett noted that Hicks

suffered from affective and anxiety-related disorders.  TR. 328.  Dr. Prickett opined that Hicks'

mental impairments resulted in moderate restriction of activities of daily living, moderate

difficulties in maintaining social functioning, and moderate difficulties in maintaining

concentration, persistence, or pace. In addition, Dr. Prickett indicated that Hicks' mental

impairments would result in one or two repeated episodes of decompensation, each of extended

duration.  TR. 338.

Dr. Prickett also prepared a mental residual functional capacity assessment.  TR. 342-44. In sum, Dr. Prickett opined that Hicks had moderate limitations in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and interact appropriately with the general public.  TR. 342-43.  Dr. Prickett also opined that Hicks "is able to understand, remember and carry out simple instructions.  She can make simple decisions and do routine tasks that are within her physical limits.  She can concentrate on simple tasks.  Social functioning . . . is generally adequate although she may be distracted by others and have difficulty relating with the general public due to anxiety."  TR. 344.

## IV.    STANDARD OF REVIEW.

This Court's review of a final decision issued by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ applied the correct legal standards.  *McDaniel v. Bowen*, 800 F.2d 1026, 1029-30 (11th Cir. 1987) (per curiam). While a great deal of deference is paid to the ALJ's factual findings, "[n]o similar presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam).

The Court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the SSA's decision. *Id*. at 1000. Even if the Court finds that the evidence weighs against the SSA's decision, it must affirm if the decision is supported by substantial evidence. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The Court may not reweigh the evidence or substitute its own judgment for that of the SSA. *Id*. When reviewing a final decision issued by the SSA, this Court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

To be entitled to Social Security disability benefits under OASDI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."[22] Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to OASDI benefits. In sum, when evaluating a claim for benefits under OASDI, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment severe?
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
> (4) Is the claimant unable to perform his or her former occupation?

---

[22] 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalcies which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

-19-

(5) Is the claimant unable to perform any other work within the economy?[23]

An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."[24]

## V.    ANALYSIS.

Hicks contends that the ALJ erred in his determination that she could perform light work because this conclusion was inconsistent with the physical RFC assessment made by Dr. Reddy and because the ALJ did not properly evaluate her mental RFC.  She submits, further, that her mental condition meets the requirements of listed impairment 12.04.  She argues, as well, that the ALJ improperly evaluated her complaints of pain and other subjective symptoms and, as such, also erred in finding that her testimony was not fully credible.  I will begin with the ALJ's analysis of Hick's mental impairments, because I find it to be dispositive.

The ALJ found that Hicks' mental impairments resulted in only mild limitations of activities of daily living, social functioning, and concentration, persistence and pace, with no likelihood of episodes of decompensation.  This conclusion is not supported by substantial evidence because it is contrary to the opinion of every treating, examining, and reviewing physician who rendered a mental RFC assessment.

---

[23] 20 C.F.R. § 404.1520(a)(4).  In an OASDI case, a claimant must establish that he or she was disabled during the time that she was insured under the act.  *See* 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

[24] *See, e.g., McDaniel*, 800 F.2d at 1030.

Beginning in December 2001, Dr. Lalli treated Hicks for major depression with continually increasing dosages of Celexa to address Hicks' symptoms.  Dr. Austin, who examined Hicks at the request of the SSA in April 2002, found her to have a major depressive disorder, recurrent, and a moderate anxiety disorder, not otherwise specified.  Shortly after Dr. Austin's assessment, Hicks voluntarily admitted herself to Lakeside Alternatives.  While Dr. Fernandez initially expressed scepticism at Hicks' motivation for seeking treatment, he ultimately concluded that her complaints of depression were "for real."  His assessment was that she had an adjustment disorder with depression secondary to pain and other stressors, with a GAF of 60, which indicates moderate difficulty in social and occupational functioning.

In May 2002, Dr. Chahal confirmed that Hicks was suffering from a major depressive disorder, which was recurrent and severe, as well as a panic disorder.  His assessment was a GAF of 55, which is in the same range as the assessment made by Dr. Fernandez.  Dr. Chahal's mental functional assessment of Hicks indicated that she would have marked limitations in maintaining social functioning and in concentration, persistence and pace, but only mild restrictions in activities of daily living.  He opined, however, that Hicks would have three repeated episodes of decompensation in a twelve month period, each of which would last at least two weeks in duration.  Her mental impairments would result in Hicks missing work more than four days per month.

Dr. Weiner and Dr. Prickett, reviewing physicians, also opined that Hicks would have more than mild restrictions in activities of daily living, social functioning, and concentration, persistence

and pace.  Both Dr. Weiner and Dr. Prickett concurred that Hicks would suffer one or two

episodes of decompensation.

Finally, the last record of treatment at Lakeside reflects that medication helped Hicks'

depression.  However, her GAF score remained at 45 to 50, which indicates that Hicks continued

to have serious impairments in social and occupational functioning.

While the determination of a claimant's RFC is a decision to be made by the ALJ, the ALJ

may not disregard consistent and uncontroverted opinions of the medical professionals who treated

and examined the claimant regarding the claimant's functional capacity.  *See Goodley v. Harris*,

608 F.2d 234, 236 (5th Cir. 1979).  In the present case, the ALJ disregarded the mental functional

assessments of treating, examining, and reviewing physicians for three stated reasons: (1)

medication helped Hicks' depression; (2) Hicks' failure to seek additional treatment, and (3)

Hicks' activities of daily living.  The last record of treatment at Lakeside undermines the

conclusion that medication significantly helped alleviate the symptoms of Hicks' depression, as

shown by the worsening GAF score assigned at that time.  With respect to failure to seek

treatment, Hicks testified that she did not have the ability to do so because of lack of gasoline for

her automobile.  Finally, Hicks' activities of daily living involve associating with her family and

attending to chores.  This is hardly sufficient to indicate that Hicks could function appropriately in

a work environment.

Hicks urges the Court to find that her mental impairment meets or equals listed impairment

12.04.  There is evidence in the record that could support such a finding, but there is also evidence

that Hicks' condition did not reach the level of marked impairments required to satisfy part B of

the listing.  Because it is clear for the reasons stated above that the Commissioner has not yet

properly evaluated Hicks' mental impairments, I conclude that the best result in this case is to

remand the case to the SSA for further proceedings.  On remand, the SSA should specifically

address listing 12.04, seeking clarification from treating and examining professionals as necessary

to gather their opinions regarding whether or not Hicks' condition meets or equals the listing.  If it

does not, the SSA must, nevertheless, give proper weight to the opinions expressed in the record

regarding the functional limitations arising from Hicks' mental impairments.  The ALJ is not at

liberty to make his own assessments from the raw data in the records.  *See Marbury v. Sullivan*,

957 F.2d 837, 840 (11th Cir. 1992).

On remand, the SSA should also reassess Hicks' complaints of pain arising from

fibromyalgia.  As cases have noted, there are no laboratory tests for fibromyalgia, and the principal

symptoms are pain all over, fatigue, disturbed sleep and stiffness, with multiple tender spots.  *See*

*Bennett v. Barnhart*, 288 F. Supp. 2d 1246, 1250 (N.D. Ala. 2003) (citing *Sarchet v. Chater*, 78

F.3d 305 (7th Cir. 1996)).  As such, the absence of objective evidence of pain is not determinative

of whether a claimant who has fibromyalgia is actually experiencing pain.

-23-

## VI.    CONCLUSION.

It is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is

**REMANDED** for further proceedings.  The Clerk of Court is directed to issue a judgment

consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 22nd day of September, 2005.

*Karla R. Spaulding*
_____
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-24-